IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| TERRY L. CARVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:05-cv-0122 |
| | ) | |
| D.C.I. CHIPPEWA CLINIC, and | ) | Judge Thomas M. Hardiman |
| DIALYSIS CLINIC INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiff Terry Carver (Carver) brought this action against her former employer, DCI

Chippewa Clinic (DCI Chippewa), and Dialysis Clinic Inc. (DCI), for gender discrimination

under Title VII of the Civil Rights Act of 1964 (Title VII). Defendants' motion for summary

judgment is the subject of this Opinion.

## I.     Facts

The following undisputed facts are derived from the record and are taken in the light most

favorable to Plaintiff Carver, the nonmovant. *Schall v. Amboy Nat'l Bank*, 279 F.3d 205, 209 (3d

Cir. 2002).

### *A.     Background*

Defendant DCI is a not-for-profit healthcare company headquartered in Nashville,

Tennessee. Its affiliate, Defendant DCI Chippewa, is located in Beaver Falls, Pennsylvania and

provides dialysis and other healthcare treatment to patients with end stage renal disease. Plaintiff

Carver was employed as a patient care technician at DCI Chippewa from May 17, 1999 until her

termination on September 18, 2003. Carver's direct supervisor was Nurse Manager Jo-Ann

Smilek (Smilek). In addition, Carver was supervised by Director of Nursing Helen Stoner

(Stoner) and James Long (Long), who was the Administrator for DCI Chippewa. Although

James Long was involved in the decision to hire Carver, he delegated day-to-day patient care

matters to Stoner and Smilek.

Upon commencing her employment, Carver received and reviewed a copy of DCI's

policies and procedures, including guidelines for attitude and personal conduct, the relevant

portions of which provide:

### ATTITUDE

Perhaps no other attribute means as much to our patients, your fellow employees,
the public, or to DCI as your attitude toward others and toward your job. A
cheerful manner, willingness to learn, and intelligent interest in our patients, a
feeling of pride and loyalty to your job, and a spirit of consideration and
friendliness toward others - all these together bring about an understanding
attitude and a happy work relationship.

### PERSONAL CONDUCT

Your personal conduct as an employee of DCI should be in keeping with our
reputation of providing quality patient services. We have purposely avoided
establishing rules and regulations to govern your behavior. You have the
responsibility to DCI and to your fellow employees and the employer. Since DCI
employees do not have written contracts of employment for specific terms and are
considered to be employees at will, any deviation from this standard of conduct as
determined by DCI may result in termination of the employment relationship.

Work rules will be posted in each facility. Violation of these rules will constitute
grounds for disciplinary action up to and including discharge. These work rules
are not all inclusive and actions not listed may also result in disciplinary action or
discharge.

DCI's policies and procedures also include a progressive discipline policy that provides:

DCI expressly reserves the right to terminate the employment relationship at any time for any lawful reason, just as the employee may terminate the employment relationship at any time.

The Steps in corrective counseling and performance improvement may not be carried out in the following order, based upon the severity of the occurrence.

1. Verbal Warning - The first step in correcting unacceptable employee performance and/or behavior will be a review of the circumstances surrounding the issue to ensure his or her understanding of DCI's expectations. The supervisor and employee will discuss potential solutions to improve employee performance and/or behavior. The employee will be made aware that a written warning, probation, suspension, or termination could result if the problem is not resolved.

2. Written Warning - If the unacceptable employee performance and/or behavior continues a written warning may be given. The supervisor and employee will discuss potential solutions to improve employee performance and/or behavior. The employee will be made aware that probation, suspension, or termination could result if the problem is not resolved.

3. Probation - If the unacceptable employee performance and/or behavior continues they may be placed on probation. Length of probation will be determined by the supervisor. The employee will be made aware that suspension or termination could result if the problem is not resolved.

4. Suspension - If the unacceptable employee performance and/or behavior continues a suspension may be warranted. Suspension may be with or without pay. The employee will be made aware that termination could result if the problem is not resolved.

5. Termination - If the unacceptable performance and/or behavior continues termination will result.

## B. *Plaintiff's Performance History*

The record indicates that Carver received below standard performance reviews on two occasions. The first performance review, issued on May 17, 2000 by Jo-Ann Smilek, found

3

Carver below standard in the following seven categories of professionalism and attitude:

> recognizes others accomplishments, provides feedback, and mentors
> others; addresses patients, coworkers, supervisors and physicians in a
> professional manner; does not talk about other patients or staff members
> in front of patients; is a positive role model for other staff; follows
> appropriate chain of command; maintains an approachable demeanor at
> all times; and resolves conflicts constructively with individuals directly
> involved.

The comments next to these categories stated that Carver: needed to "[c]ontinue to work on

using patient (sic) with peers - communicate openly and positively;" should "continue to work

on maintaining professional demeanor;" was "not always tolerant of peers;" needed to be "more

approachable [with management] - continue to work on [approachability with] peers;" and had a

"verbal altercation with a peer on the floor." Carver also was rated below standard because of

attendance problems. Goals created at the end of the review by Carver and Smilek included

"[c]ontinuing to work on approachability and tolerance of her peers."

One year later, Smilek completed a second performance review on Carver in which she

was rated below standard in the following four categories: "recognizes others [sic]

accomplishments, provides feedback, and mentors others; is a positive role model for other staff;

maintains an approachable demeanor at all times; and maintains a good working relationship

with other staff disciplines." The comments next to these categories stated that Carver:

"demonstrates a decreased tolerance for coworkers (sic) at times; is not open to criticism but has

improved in past 3 mo[nths]; and meets standard [of a good relationship with other staff] with

other departments but not with nursing or some technicians." Carver also was below standard

because of attendance problems. Again, Carver and her supervisor set a goal to improve her

teamwork and professionalism: "Terry needs to participate with other team members by

4

maintaining an approachable demeanor. Terry can isolate herself from her team members."

In addition to the foregoing critical performance reviews, Carver received four formal written warnings and one verbal warning. The first written warning came on December 29, 1999 because of attendance problems and Carver's failure to notify her supervisor of an illness.

Carver received her second written warning on March 5, 2001 for two incidents of misconduct: carelessness and breaking a safety rule. The first incident of misconduct took place on March 1, 2001 when Carver rode a patient's scooter around the clinic for ten minutes at high rates of speed, placing patients and staff at risk. The second incident took place two days later, on March 3, 2001. On that day, Carver again rode a patient's scooter at high rates of speed and was ordered to cease doing so by her team leader. Carver was suspended for one day without pay as a result of the two incidents and was warned that continued careless behavior would result in further disciplinary action, including termination. Nurse Manager Smilek, Director of Nursing Stoner, and Carver herself all signed the written warning. Carver later wrote a letter to Stoner opining that she should have been warned rather than suspended. Carver explained that she asked the patient if she could ride the scooter, and that she was trying to make "patients laugh and feel good about themselves."

Approximately a year after the second written warning, Nurse Manager Smilek issued Carver her third written warning. On March 28, 2002, Carver was warned that further absenteeism could result in suspension. That same year, Carver was given an oral warning concerning attendance on October 15, 2002, and her fourth written warning, again concerning attendance, on December 4, 2002. Smilek warned Carver that she would be suspended if the problems continued.

5

## C.    Plaintiff's Termination

On September 15, 2003, Carver "exchanged words" with another employee, Michael
Bonanni (Bonanni). Carver testified in her deposition that she called Bonanni a "dummy," and
Bonanni responded by calling her an "asshole." This exchange was witnessed by at least one
patient and overheard by Nurse Manager Smilek, who found that Carver caused the confrontation
with her "attitude and approach." Smilek reported the incident to Director of Nursing Stoner and
Administrator Long in a contemporaneous memorandum in which Smilek also noted that Carver
had a verbal confrontation in July 2003 with fellow employee Cheryl Tucker and in August 2003
with patient Ditullio, who asked to use the restroom but was prohibited from doing so because he
was having chest pains. When Ditullio persisted, Carver responded: "I am not letting you go to
the bathroom. You are having chest pain. Just shit yourself if you can't hold it." After the
confrontations with Tucker and Ditullio, Carver was verbally counseled and Smilek assessed
Carver's attitude as "very detrimental to [the] department."

In the same memorandum, Smilek reported that on the day of the exchange with Bonanni,
Carver entered Smilek's office and informed her that she was not going to learn priming, which
was one of her job duties. Carver stated: "I was not hired to do technical duties; I was hired for
patient care only. I'm telling you now I will be the first person to call the state if something
happens to these patients. I am the only one who cares about patients!" Smilek informed Carver
that priming was part of her duties, and that she had three options: "she could resign, she could
change her attitude and go out and learn how to prime, or she could go home immediately."
Carver later returned to her job and learned priming. The next day, however, September 16,
2003, Carver failed to come to work and failed to follow the correct call off procedures.

6

In response to Smilek's September 15, 2003 memorandum, Long and Stoner contacted Dan Watson (Watson), the Associate Director of Human Resources at the DCI home office in Nashville, Tennessee. Watson stated that Carver's attitude toward patients and staff was unacceptable, and her unwillingness to accept job related duties was intolerable. Watson recommended that Stoner and Long meet with both Carver and Bonanni separately to hear their respective sides of the story. He also recommended that they obtain a commitment from both Carver and Bonanni to improve their behavior if they admitted to the verbal exchange. Finally, he recommended that if Carver was unwilling to commit to improvement, given her disciplinary record, she should be terminated.

Soon after Watson provided guidance, Stoner, Long, and Smilek met with Carver on September 18, 2003 to discuss the Bonanni incident and her employment status. Carver admitted that she had a verbal exchange with Bonanni in front of patients, and that she had a similar exchange with another employee in July. Carver responded by raising her voice, insisting that she should be allowed to confront Bonanni and any other employee she did not get along with, and by saying that it was not her job to get along with other employees. In short, Carver did not accept responsibility for her actions and was unwilling to commit to improving. As a result, Long terminated Carver at the end of the meeting.

That same day, Long met with Bonanni to have a discussion similar to the one held with Carver. Unlike Carver, Bonanni admitted that he engaged in inappropriate behavior and was apologetic. Moreover, Bonanni committed to improving his behavior. Also unlike Carver, Bonanni had never been suspended or warned for unprofessional behavior or any similar conduct prior to the meeting. Given his discipline record and commitment to improve, Long gave

7

Bonanni a written warning and did not terminate him.

In affidavits procured by Carver during discovery, other female employees at DCI claim that Bonanni verbally abused them or engaged in other on-the-job misconduct, yet was spared discipline. In one affidavit, Susanna Stenger (Stenger) complained that she and Barb Donegan (Donegan) were disciplined for treating the wrong kidney, whereas Bonanni — whose miscoding of the kidney was, according to Stenger, the cause of the mistake — was not disciplined, despite Stenger's complaints to DCI management. In a separate affidavit, Alicia Haskins (Haskins) claimed that some unidentified third party told her that Bonanni was overheard making sexually inappropriate comments about Haskins and Jeanine Osso (Osso), another DCI employee, while Haskins and Osso vacationed together; despite Haskins's complaints to her supervisors, Bonanni was not disciplined. Evelyn Beatty (Beatty) submitted an affidavit complaining that Bonanni had yelled at her and Tina Buchanan (Buchanan) submitted a separate affidavit in which she complained that Bonanni screamed obscenities at her several times in 2003. Neither Beatty nor Buchanan ever reported these incidents to DCI management, however.

## II.    Analysis

Summary judgment is required on an issue or a claim when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). An issue is "material" only if the factual dispute "might affect the outcome of the suit under the

8

governing law." *Anderson*, 477 U.S. at 248.

"Summary judgment procedure is properly regarded not as a disfavorable procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted). The parties have a duty to present evidence; neither statements of counsel in briefs nor speculative or conclusory allegations satisfy this duty. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). After the moving party has filed a properly supported motion, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party must make a showing sufficient to establish the existence of each element essential to her case on which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

### *A. Title VII*

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to her compensation, terms, or privileges of employment because of race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a)(1). The burden-shifting framework of *McDonnell Douglas Corp. v. Green* controls claims of employment discrimination as follows: (1) plaintiff must establish a *prima facie* case; (2) defendants must then offer a legitimate nondiscriminatory reason for the employment decision in question; and (3) plaintiff may then demonstrate that the stated reason is merely pretext for illegal discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *refined in Texas Dep't of Cmty. Affairs v.*

9

*Burdine*, 450 U.S. 248 (1981); *clarified in St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) (citations omitted).

### 1.    *Prima Facie Case*

To establish a *prima facie* case of employment discrimination, Carver must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated employees, not of the protected class, received more favorable treatment. *Burdine,* 450 U.S. at 253 n.6; *McDonnell Douglas*, 411 U.S. at 802. This burden is one of production, not persuasion. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142 (2000) (citations omitted).

In the case at bar, Carver has established the first and third elements. As a female, Carver is a member of a protected class. Secondly, Carver suffered an adverse employment action when DCI terminated her employment on September 18, 2003. Neither party disputes the facts supporting these elements.

Although the inferences to be drawn from the facts underlying the second element are in dispute, the facts themselves are not. There is no plausible allegation that Carver was not qualified to perform her basic job-related duties. Carver concedes that her record was not completely clean, and that she had several verbal altercations with other employees and patients. Defendants seize upon this concession, arguing that Carver was not qualified for her position because, by dint of her interpersonal conflicts with co-workers and patients, she was not meeting DCI's legitimate expectations. It is true that, "to be 'qualified,' a plaintiff must have been performing his job at a level that met his employer's legitimate expectations at the time of his

10

discharge." *Detz v. Greiner Industries, Inc.,* 346 F.3d 109, 119 (3d Cir. 2003). But although Carver's job carried with it the implicit expectation that she could interact civilly with DCI staff and patients, the argument that the periodic need to discipline her for her outbursts made her "not qualified" for her job as a whole fails under controlling law. *See Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 798 n.13 (3d Cir. 2003) (explaining that past disciplinary actions against an employee do not lead to the inference that he was unqualified for his position). There is no reasonable dispute that, on paper, at least, Carver was qualified for the position she held. That being so, and reviewing the facts in the light most favorable to the Plaintiff, the Court finds that Carver was qualified for her position. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir. 1995) (relying upon objective factors only — *i.e.*, the plaintiff's twenty years of experience and the positions he held during that period — to conclude that he was "qualified").

The brunt of the dispute as to the *prima facie* case involves the fourth factor: *i.e.,* that similarly situated employees not of the protected class were treated more favorably. Carver contends that she is similarly situated to Michael Bonanni. This argument is unpersuasive for several reasons. First, Carver (patient care technician) and Bonanni (equipment technician) held different jobs and reported to different supervisors. More importantly, Bonanni and Carver had quite different disciplinary records. Carver received below standard evaluations on two performance reviews, while Bonanni did not. Carver was given written and verbal warnings for unprofessional behavior and poor performance, while Bonanni was not. Moreover, unlike Bonanni, Carver previously was suspended for a day. Finally, and most importantly, while Bonanni reacted positively to the meeting with management by assuring he would improve his behavior, Carver responded poorly by raising her voice, demanding the power to confront co-

11

workers, and insisting that it was not her job to get along with other employees. Carver was unapologetic and did not commit to improving her behavior. Consequently, she was not at all similarly situated to Bonanni.

Carver also contends that John Kos (Kos) is a comparator. To demonstrate that Kos is a valid comparator, Carver must show that the duties each performed "were comparable or that they were otherwise similarly situated." *Anderson v. Consol. Rail. Corp.,* 297 F.3d 242, 250 (3d Cir. 2002). The record shows that Carver (patient care technician) and Kos (refuse technician) held different jobs and had different supervisors. In addition, DCI actually terminated Kos according to its policies, so he received the same ultimate discipline as Carver. To the extent that Carver received different treatment, the record shows that she was treated even *more favorably* than Kos, in that she was terminated after her third instance of misconduct, whereas DCI fired Kos after his second infraction. Because Carver must show that she was treated *less* — not more — favorably than her comparator, *see Hicks,* 509 U.S. at 506, Kos is not a valid comparator.

Carver also contends that, because DCI disciplined her for riding patients' scooters, she was treated differently than four employees who rode patients' scooters and yet were not disciplined. Specifically, Carver points out that she was suspended twice for riding a patient's scooter while the four other employees were not reprimanded; of those four, two were female and two were male. As Carver's own testimony established, however, the four other employees rode the scooters to remove them from the treatment floor, while Carver was essentially joyriding the scooters to get a laugh out of the patients. On these facts, it is clear that these employees are not valid comparators, as they were not engaged "in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct and the employer's treatment of

12

them for it." *Bullock v. Children's Hosp. of Philadelphia,* 71 F. Supp.2d 482, 489-90 (E.D. Pa. 1999). Even if the Court were inclined to ignore this critical difference — and it is not so inclined — Carver cannot claim the other two women who rode the scooters were comparators because she and these women occupy the same protected class. *See Goosby v. Johnson & Johnson Med. Inc.,* 228 F.3d 313, 318-19 (3d Cir. 2000) (noting that a plaintiff must demonstrate that employees not of the same class and were treated more favorably). Finally, the fact that some employees were of the same protected class as Carver and some were not — combined with the fact that all were treated equally — further reinforces the inference that DCI meted out punishment based on the gravity of the act, rather than on the gender of the actor.

In sum, because Carver has not identified a valid comparator, she cannot establish the fourth element of the *prima facie* case. Accordingly, Defendants are entitled to judgment as a matter of law.

### 2.  *Legitimate Nondiscriminatory Reason for Termination*

Although Carver's inability to make out a *prima facie* case of discrimination obviates the need for the Court to complete all three steps of the *McDonnell Douglas* inquiry, for the sake of completeness the Court will discuss the next step. As will be demonstrated, even had Carver stated a *prima facie* case, her claim would fail because she cannot establish that the legitimate, nondiscriminatory reason DCI has offered for firing her was pretextual.

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802. Importantly, the second *McDonnell Douglas*

13

step only shifts the burden of production; the employer need not prove that the reason it offers was the actual reason for its action. *See Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir. 1997). Because the employer's burden at step two is relatively light, it is satisfied if the defendant articulates *any* legitimate reason for the discharge. *See Fuentes,* 32 F.3d at 763.

In this case, even assuming *arguendo* that Carver could prove her *prima facie* case, DCI has offered a legitimate, nondiscriminatory reason for terminating her. Under DCI's progressive discipline policy, the step after suspension is termination and DCI has the right to terminate the employment relationship at any time. The undisputed evidence shows that Carver received poor reviews on several evaluations and was reminded that she needed to improve her professionalism with other employees. Also, shortly before her termination she was involved in three confrontations on the treatment floor: one with Bonanni, one with Cheryl Tucker, and one with Mr. Ditullio. Finally, and perhaps most significantly, the next disciplinary step after Carver's suspension for riding the scooter was termination under the progressive discipline policy. These are all legitimate, nondiscriminatory reasons for terminating an employee. *See Pollock v. American Tele. & Tele. Long Lines,* 794 F.2d 860, 863-64 (3d Cir. 1986) (finding at the second step of the *McDonnell Douglas* inquiry that an employee's record of insubordination, poor performance, and misconduct all were legitimate, nondiscriminatory reasons for her discharge).

In sum, the record demonstrates that the reasons DCI offered for terminating Carver — which were, in essence, because of her unprofessional conduct, and not because of any discriminatory motive — easily satisfy step two of the *McDonnell Douglas* inquiry. Accordingly, even if Carver were able to prove a *prima facie* case of gender discrimination, the Court would be required to reach the issue of pretext because DCI has offered legitimate,

14

nondiscriminatory reasons for its decision to terminate her employment.

### 3.   Pretext

Finally, even if Carver could make out a *prima facie* case of discrimination, her claims

would fail because she cannot meet her burden of demonstrating that the legitimate,

nondiscriminatory reasons that DCI proffered for terminating her — to wit, her on-the-job

misconduct, altercations with patients and staff, and her unrepentant insubordination — were

pretextual.

To rebut the stated reason for termination, Carver must show that "[s]he was the victim of

intentional discrimination by showing that the employer's proffered explanation is unworthy of

credence." *Reeves*, 530 U.S. at 143. The Third Circuit has developed two methods of showing

pretext:

[A] plaintiff who has made out a prima facie case may defeat a motion for
summary judgment by either (i) discrediting the proffered reasons, either
circumstantially or directly, or (ii) adducing evidence, whether circumstantial or
direct, that discrimination was more likely than not a motivating or determinative
cause of the adverse employment action.

*Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005) (*citing Fuentes v. Perskie*, 32 F.3d 759, 764

(3d Cir. 1994)). In other words, "[a] plaintiff may survive summary judgment . . . if the plaintiff

produced sufficient evidence to raise a genuine issue of fact as to whether the employer's

proffered reasons were not its true reasons for the challenged employment action." *Sheridan,*

100 F.3d at 1067. Under either *Fuentes* method, "[t]he question is not whether the employer

made the best or even a sound business decision; it is whether the real reason is discrimination."

*Kautz v. Met-Pro Corp.* 412 F.3d 463, 468 (3d Cir. 2005) (citation omitted). The ultimate

15

burden of persuasion does, however, remain with the plaintiff at all times. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 698 (3d Cir. 1995).

Accordingly, it is clear that a plaintiff must marshal particular evidence to avoid summary judgment by the first method identified in *Fuentes*. Specifically:

> . . . the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action.

*Fuentes*, 32 F.3d at 764. The plaintiff may do this by demonstrating that the reasons are "weak, implausible, contradictory, or incoherent." *Id.* at 765. In this case, Carver admits that DCI's stated reasons for termination are truthful and valid. Therefore, she cannot raise an issue of fact under the first method.

Under the second *Fuentes* method, Carver may show pretext by demonstrating "that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected class categories." *Id.* Carver confines her claim to this second method, insisting that Bonanni had been given favorable treatment and that DCI discriminated against other female employees. In support of this contention, Carver claims that her co-worker, Bonanni, called her a "fucking bitch" in August 1999, and maintains that she reported that outburst to Smilek — who brought Bonanni into her office to discuss the incident but did not issue any written warning or more severe punishment to Bonanni.

Accepting Carver's rendition of this incident as true, as the Court must, the incident still does not demonstrate any discrimination by DCI. Succinctly, the incident fails to create an issue

16

of pretext for discrimination because it is too far removed in time from Carver's termination. As

the Third Circuit has explained:

> A court should now consider the passage of time between the other act and the act
> alleged to be discriminatory. There is a point at which a prior or subsequent act
> becomes so remote in time from the alleged discriminatory act at issue, that the
> former cannot, as a matter of law, be relevant to intent.

*Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003). In the case at bar, the

incident involving Bonanni and Carver in 1999 was four years removed from Carver's

termination. Therefore, under Third Circuit precedent, the earlier incident is too remote as a

matter of law from the second to demonstrate intent or to be relevant to pretext. *See, e.g.*,

*Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995) (finding that a

comment made almost two years before the plaintiff's termination was too "temporally remote"

to support the inference of pretext); *see also Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983

F.2d 509, 545, 523 (3d Cir. 1992) (holding that a law firm partner's discriminatory comment to

an associate five years before a partnership decision at issue was too temporally remote and

isolated to be considered evidence of pretext).

Even if the Court could overlook the nearly four-year gap separating the August 1999

incident and Carver's termination on September 18, 2003, other defects in the evidence would

defeat Carver's argument that the legitimate, nondiscriminatory reasons DCI offered for

terminating her masked an insidious gender bias. As noted previously, Bonanni and Carver held

different positions, had different supervisors, and, most importantly, had very different

disciplinary records. Even assuming that DCI erred when it failed to discipline Bonanni as a

result of the 1999 incident, this assumption would not support the inference that DCI's decision

to terminate Carver's employment over four years later was more likely than not the product of

17

discrimination. This is especially so when one considers Carver's inappropriate reaction to the September 18, 2003 meeting — which was in stark contradistinction to Bonanni's contrite response. *See, e.g., Fries v. Metropolitan Management Corp.*, 293 F. Supp.2d 498, 504 n.2 (E.D. Pa. 2003) (holding that a plaintiff could not show that his discharge for insubordination and for refusing to apologize for his insubordinate behavior was a pretext for discrimination).

Carver also suggests that men were generally treated better than women by DCI. In support of this argument, Carver offers the affidavits of Beatty and Buchanan. These witnesses aver generally that DCI treated male staff — and particularly, Bonanni — more favorably than female staff. Evidence of the treatment of other employees of the protected class is relevant to whether the employer's proffered explanation is pretextual. *See Ansell*, 347 F.3d at 521 (*citing McDonnell*, 411 U.S. at 804). The Beatty and Buchanan affidavits are not probative of DCI's intent, however, for one basic reason: their problems with Bonanni were never reported to DCI management. Incidents that are not reported or otherwise made known to a decisionmaker are irrelevant to a determination of pretext. *See Fuentes*, 32 F.3d at 766-67 (noting that the state of mind of the relevant decisionmaker must be shown to establish that a defendant's proffered reasons are, in fact, pretextual). On this point, it bears emphasis that "the inquiry into pretext centers upon the employer's beliefs," *Sempier*, 45 F.3d 731. Here, Carver's argument with respect to Beatty and Buchanan fails because they never informed DCI decisionmakers of their problems with Bonanni.

The other two affidavits Carver has submitted — from Stenger and Haskins — rest on a somewhat different footing, because both of these witnesses insist that they *did* complain to DCI management about their respective run-ins with Bonanni. Stenger, another employee at DCI

18

Chippewa, averred that she was treated differently than Bonanni. On the occasion in question, Stenger and Barb Donegan placed a patient on an incorrect kidney, allegedly because Bonanni had mis-coded the organ in the DCI computer system; the two women were suspended for that flub, but Bonanni was not. Also, Haskins claims in her affidavit that Bonanni made an inappropriate sexual comment about her and another female employee. Haskins maintains that she complained to Long and Stoner, but states that Bonanni was not disciplined.

First, even assuming that Bonanni was culpable in these incidents, this Court is not to determine what punishment, if any, Bonanni should have received. *See Logue v. Int'l Rehab. Assocs., Inc.,* 837 F.2d 150, 155 n.5 (3d Cir. 1988) ("[O]ur task is not to assess the overall fairness of [the] ... employer's actions."). Indeed, "our inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir. 1988); *see also Hicks v. Arthur,* 878 F. Supp. 737, 739 (E.D. Pa. 1995), *aff'd,* 72 F.3d 122 (3d Cir. 1995) (noting that the fact that a decision is ill-informed or ill-considered does not evince pretext). This restraint is especially important where, as is true here, an inquiry into the abstract fairness of an employment decision would risk comparing apples to oranges. It bears emphasis that Stenger and Donegan, patient care technicians, were not similarly situated to Bonanni, an equipment technician. Each position has different job-related duties and responsibilities. Moreover, Stenger and Donegan reported to a different supervisor than Bonanni and were disciplined by different people. Therefore, because Stenger and Donegan were not similarly situated to Bonanni, no unlawful discrimination occurred, and the incident is not relevant to pretext. *See Goosby,* 228 F.3d at 322 (finding that a plaintiff could not show pretext by relying on her employer's differential treatment of other

19

employees who were not similarly situated to her). This being so, the fact that one male
employee received a lesser punishment than Stenger and Donegan is not dispositive on the issue
of Carver's discharge was the result of gender-based discrimination. *See Simpson v. Kay
Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 646-47 (3d Cir. 1998) (explaining that reliance on
the employer's more favorable treatment of a single member of the non-protected class was
insufficient to show pretext).

Second, viewing the Haskins affidavit in the light most favorable to Carver, there is
nothing in the record to permit the inference that DCI's handling of the alleged Haskins-Bonanni
incident was motivated by gender discrimination. Although Haskins claims she wrote a letter to
Long about the incident with Bonanni more than one year after she had been transferred out of
Bonanni's facility and into another DCI location, she admits that she handled the matter by
confronting Bonanni himself. Haskins does not allege that Bonanni eluded discipline for this
incident; indeed, she admits that Long assured her that the situation "would be dealt with."
Certainly, Long's denial of having received any letter from Haskins — along with his insistence
that the Carver-Bonanni altercation was the "only incident we were dealing with" relating to
Bonanni — creates a dispute, but the dispute is immaterial because Haskins does not allege that
Bonanni escaped discipline *because of his gender*. Indeed, the primary quarrel that Haskins
appears to have regarding DCI's handling of the incident is that management did not keep the
letter she had written. Again, however, Haskins does not contend this letter was discarded
because of impermissible gender discrimination. Although Carver invites the Court to draw the
inference that DCI permitted Bonanni to get away with sexually-inappropriate comments about
Haskins or discarded Haskins' letter out of gender-based animus, these are speculative leaps that

20

not even Haskins herself ventured to make. *See Boykins v. Lucent Technologies, Inc.,* 78 F.
Supp.2d 402, 413 (E.D. Pa. 2000) ("Pretext cannot be established based on speculation and mere
conclusory allegations.") (citation omitted); *see also Morrison v. Booth,* 763 F.2d 1366, 1371
(11th Cir. 1985) (noting that plaintiffs cannot "simply leap from the premise that they were the
victims of discrimination to the position that others must also have been.").

In the end, Carver's arguments boil down to the assertion that DCI should have either
fired *both* her and Bonanni, or *neither* of them. But a plaintiff cannot show pretext by "simply
show[ing] that the employer's decision was wrong or mistaken." *See Brewer,* 72 F.3d at 331.
Rather, she must create a triable issue of fact that an illegal motive animated the decision. Read
in the light most favorable to Carver, the record shows that neither she nor Bonanni were
particularly pleasant employees or co-workers — irrespective of their gender. Given that Carver
possessed a more serious disciplinary history than Bonanni, and especially in light of her defiant
attitude in the aftermath of her quarrel with Bonanni, the fact that DCI fired her and not Bonanni
is insufficient to create a material dispute as to whether the proffered reason for this choice was
merely a pretext for an illegal discriminatory motive. Therefore, even if Carver were able to
establish a *prima facie* case of gender discrimination, DCI would be entitled to summary
judgment for her failure to raise an issue of pretext.

21

## III.    Conclusion

For all of the foregoing reasons, Defendants DCI and DCI Chippewa are entitled to

judgment as a matter of law.


Thos M. Hardiman

Thomas M. Hardiman
United States District Judge

Dated:   October 12, 2006

22